REID, Judge.
The Collector of Revenue of the State of Louisiana has filed this suit for the sum of $7971.81 plus statutory penalty, interest and attorneys fees, under the provisions of the “Power Use Tax” levied pursuant to LSA-R.S. 47:1151 et seq.
There is very little dispute about the facts of this case. The defendant, Louisiana Ready Mix Company, Inc. is a corporation located in the Parish of East Baton Rouge and engaged in the manufacture of concrete. The ingredients of the concrete, sand, gravel and cement are conveyed by belt separated elevated bins at the plant. They are then weighed and measured and fed from the hopper into specially designed trucks, power units of which are (1) used to mix ingredients with water while on the trucks, so that they will become ready mixed concrete, (2) to propel the loaded trucks to the job site (3) to pour the concrete at the job site.
The issue in this case is whether the defendant’s trucks' and the motors used in the power units are entitled to an exemption under LSA-R.S. 47:1153, subd. C.
The case was tried and the Judge of the Lower Court rendered judgment in favor of the defendant on the grounds that they were exempt from the power use tax. From this judgment plaintiff has brought this appeal.
The trucks involved in this controversy employ power from the truck engines to turn the mixer drum. This is done by means of a “power take off” system, consisting of a drive shaft and transmission separate from the drive shaft and transmission that power the truck itself. The mixer drums are added to the truck bodies and chassis after they have been purchased and these “power take off” trucks are distinguished from concrete trucks utilizing engines separate from the truck engine to turn the mixer drum.
The power use tax is levied under the provisions of LSA-R.S. 47:1151 et seq., which provides as follows:
“Every person engaged in any business or occupation in which he uses electrical or mechanical power of more than ten horsepower and does not procure all the power required in the conduct of his business or occupation from a person subject to the tax imposed by R.S. 47:-1061, shall be subject to the payment of an excise, license or privilege tax of fifty cents (500) per annum for each horsepower of capacity of the machinery or apparatus known as the “prime mover” or “prime movers”, operated by him for the purpose of producing power for use in the conduct of his business or occupation.
*143 The tax levied herein shall be in addition to all other taxes of every kind, and shall not affect the liability of the parties so taxed for the payment of all other state, parochial, municipal, district and special taxes levied upon their real estate and other corporeal property.”
The exemption provided by law and claimed by the defendant is found in LSA-R.S. 1153, subd. C which reads as follows:
“In computing the tax imposed by R.S. 47:1151, there shall be excluded from the horsepower capacity of all machinery and apparatus operated, that part of such capacity * * * directly used * * * in propelling or motivating any automobile, truck, tug, vessel, or other self-propelled vehicle, on land, water, or air, where the primary use of such power is self-propulsion.” As amended Acts 1952, No. 210, S. 1.
In line with the provisions of this statute the plaintiff Collector of Revenue promulgated certain regulations which provide for self propelled vehicles as follows:
“SELF-PROPELLED VEHICLES * * * The Statute exempts from tax self-propelled vehicles where the primary use of the power is self-propulsion. The exemption applies only when the primary or main use of the power of the prime mover is propulsion of the vehicle, even though some part of the power may be used for other purposes. Automobiles, trucks, tractors, boats, hysters and bull dozers, are common examples of self-propelled vehicles of this class.
Where the primary or main use of the power of the prime mover is for work of other than propulsion of the vehicle (even though part of the power does propel the vehicle), the vehicle is not a self-propelled vehicle and the prime mover forms a part of the tax base. Common examples of this class of taxable vehicles are: Draglines, side boom tractors, pipeline brush type cleaners, road concrete finishing machines, ditch diggers, suction dredges and floating dredges.”
The defendant appellee contends, and which contention was sustained by the Trial Judge, that the concrete trucks utilize “power take off” from the truck engines to turn the truck’s mixer drum, and are exempt from the “power use tax” under the provisions of LSA-R.S. 47:1153, subd. C, and appellant’s regulations hereinabove set out. The question before us now is whether the “primary use” of the trucks engine power is self propulsion by which of course would entitle the defendant to the exemption. If the primary use of the engine power was operating or turning the mixing drum on the truck then of course plaintiff’s contention that the power use tax would apply would be correct.
The plaintiff appellant sets forth the following specifications of error:
“(1) The lower court erred in holding that Taxpayer had submitted sufficient proof to overcome the prima facie case in favor of the Collector which the Collector had established by his pleadings and affidavit.
(2) The lower court erred in holding that there was only one primary use of the power units taxed and that was self-propulsion.
(3) Alternatively, if there was only one primary use of the power units and that was self propulsion the lower court erred in dismissing the Collector’s claim in its entirety because the exemption from use tax provided by R.S. 47-1153 C applies only to that portion of the total power capacity of each power unit which is used for self-propulsion.”
We will take these up in the order in which they are listed. The first contention of the appellant is that the appellee is entitled to no exemption because it has failed to overcome the prima facie case established by appellant’s pleadings and affidavits, stating that the tax was due. This failure results from the lack of proof by appellee of *144 the portion of the truck horsepower capacity-used in self-propulsion and since only that portion is exempt no case of exemption is made out.
We see no merit in this contention because the question before the Court is what is the primary use of the power units on the truck. The appellant contends that there may be several primary purposes or uses but we feel that there can only be one primary. Any other use would be secondary, and since the law grants an exemption to trucks where the primary use is self-propulsion, the main issue here is to determine the primary use of the trucks engine power.
There is no question but what the pleadings and affidavits make a prima facie case. If it had not the defendant would have filed an exception of no cause of action. However, that prima facie case can be overcome by proof of the fact that the trucks in question are exempt from the tax.
Plaintiff is attempting in this connection to place the burden upon the defendant of determining how much horsepower is used for the turning of the mixer. If the horsepower used for the turning of the mixer could be separated from the horsepower used in operating the truck it would unquestionably be taxable. The Collector’s own director of severance tax division Mr. Gaudet, testified that this was practically impossible. We quote from his testimony as follows:
“A: It transports, in a sense, the material which it also manufactures. It is a, it seems a very definite dual purpose piece of equipment and the fact that one, the use of the equipment in one operation is exempt operation doesn’t change the fact that its use in the other operation makes it a taxable operation. And the law provides that the tax is based on the brake horsepower capacity of the unit operated at the rate of fifty cents per annum for each brake horsepower capacity of the machine or apparatus used. So, we have no alternative other than to tax this equipment for the full period of time at the full rate. This occurs in many businesses throughout the State of Louisiana, that the full capacity is not used continuously all the time; as a matter of fact, it would be rather difficult to make a determination of the actual amount of power consumed by every prime mover m the State of Louisiana. If we had to make that determination, I don’t know how we could administer the law.”
The plaintiff in its brief recognizes that under these regulations there has to be some guide lines established in order to determine which is exempt and which is not exempt.
We quote from their brief the following in support of this recognition :
“ * * * From an administrative standpoint it is often both difficult and expensive to allocate what portion of the horse-capacity of a power unit used in self-propelled machinery is exempt and which portion is taxable. To alleviate this situation the Collector has devised a rule which not only accomplishes the purpose of the Statute but also is easy to apply in the great majority of cases. That rule is stated in the regulations * * *
“This regulation recognizes the fact that there will rarely be an instance in which a self-propelled mechanical device will not have a part of the horsepower capacity of its power unit taxable and some not taxable. It is designed to take care of that great majority of cases when very little horsepower capacity is taxable or where very little horsepower capacity is non taxable. * * * ”
We now come to the main issue in this case and that is the primary use of the engine located on these trucks.
The plaintiff contends in his brief that there can be two primary uses of the motor, or engine, located on these trucks. One use is the self-propulsion of the truck itself, and the other is the use of it when it turns *145 the drum which mixes the concrete, when the truck as a general use is stationary.
The word “primary” has been defined in 72 C.J.S. page 500 as follows:
“The adjective ‘primary’ has many meanings and different shades of meaning, varying in accordance with the subject word to which it is applied; but always its basic idea is ‘first’ and it is defined generally as meaning first. It may refer to the first in order of time, and thus mean original or initial; or in order of importance, and thus mean chief or principal ; or in order of derivation, and thus mean fundamental.” (Emphasis supplied)
On page 501 of Volume 72 of C.J.S. the term is further defined as follows:
“ ‘Primary’, when applied to a single subject often means first, chief, or principal, but that is not always the case, and an activity of function may be primary if it is substantial. ‘Primary’ is not restricted to the singular, it may refer to the plural.”
The smallest horsepower motor on the defendant’s trucks has 160 horsepower. According to the testimony a maximum of five to seven horsepower per cubic yard of material is required for the mixing of ready mixed concrete. This is when, of course, the drums are being loaded, and a total of 1 to 3 yards of material is required in mixing. The same amount of horsepower is required for unloading. The largest cubic yard capacity of any of appellee’s trucks is 8 yards. We, therefore, have a total horsepower of at maximum 56 horsepower to turn the drum, which is little more than one-third of the horsepower of the motor on the truck.
Coming to the time elapsed in turning the drum while the truck is stationary as against the turning of the drum while the truck is moving we find that the average round trip from plant site to job site and back is about an hour and fifteen minutes. Loading the truck with material to be delivered to the job site normally takes less than four minutes, unloading takes less time than that. Therefore, it appears that the total time the truck is stationary and the drum is being turned is little more than ten per cent of the total time the truck is away from the plant on an average delivery.
We next consider the amount of fuel used for self-propulsion as against the fuel needed to supply power to turn the drums. In this connection we quote from the testimony of the defendant’s president, Mr. Johnston Barrow, as follows:
“Q: Have you ever had any occasion to run a test regarding loaded and unloaded concrete trucks?
A: Yes, I ran a test on them for fuel.
Q: What, would you describe that to us ?
A: Yes, I took one of my eight-yard mixers and I put eight yards of gravel in there. I didn’t put the cement and water and I filled the fuel tank level full where you couldn’t pour another cupful in it and I backed under there and got under the hopper, eight yards of gravel and mixed it just like you would mix a load of concrete, and I drove from my plant on Greenwell Springs Road to the Airline Highway at LaPlace, fifty-one miles exactly, and I filled up down there exactly, the tank exactly like I was when we first stated.
Q: How much fuel did it take ?
A: It took ten gallons of fuel to fill it back, that was five and one-tenths miles to the gallon. Then I brought the same load back to the plant without turning the mixer until I got to the gravel pile, then I revved the mixer up to discharge the eight yards of gravel, and I tell you, you can time it, eight yards of gravel is longer to get out of the mixer than eight yards of concrete. And then I filled up and it took exactly nine point five gallons to fill it coming back without the mixer turning, so the difference of the two trips *146 was forty-five hundredths of a gallon of fuel.
*Q : And the distance each way ?
.A: Exactly the same, fifty-one miles, ■checked with an automobile running along with the truck.”
It can be seen from this testimony as with iCthe previously mentioned relative horse-power and the relative time for each phase ..of the operation, the fuel test again reveals only a relatively minor portion applicable to the turning of the drum, with -the major portion devoted to self-propulsion ..of the truck. Another idea in regard to the -primary use of the truck is the relative ■.•sizes of the regular truck transmission as ..compared with transmissions of “power take ••off” units. There were introduced into evi-dence several exhibits showing the relative small size of the transmission systems -used to carry power from the truck engine 'to the truck’s mixer drums. Contrasting the •.sizes of the transmissions used to turn -the concrete mixer on the one hand and -.those used only to propel the trucks them-:selves we find that a relatively large uni■•versal joint used to send the power to the -.truck itself where a much smaller universal joint is employed in transmitting power to -the concrete mixer drum.
Plaintiff appellant urges that since the -taxpayer is in the business of manufacturing ready mixed concrete for sale it is apparent that the matter of prime importance ■rto him is the manufacture of the product iand that the “primary use” of the “prime : movers” of these mobile mixers is to manu- ; facture the product.
There is no question but that the defend- -. ant’s business is mixing ready mixed con- . Crete but it is also of prime importance ■to deliver that to the job site. What good would it do to manufacture the concrete .and not get it to the job site. We feel that •the primary use of these mobile concrete •mixers is the delivery of the ready mixed • concrete to the job site. We do not think t-there is any question but what they could get the materials and mix it at the job site, but this no doubt would prove much more expensive in point of time and money.
We feel that the law definitely sets out that the question of the exemption is governed by the primary use of the motor, and for the reasons above set forth we find that the primary use of the motors in most of these trucks is self-propulsion of the truck, in delivering the ready mixed concrete from the plant to the job site.
Finally, the appellant points out that if he is not entitled to recover on the “power take off” trucks that there were ten of ap-pellee’s trucks that employ separate engines to turn the mixer drums and that judgment should be entered with tax due on these. This is unquestionably true and is conceded by the defendant appellee. According to the testimony of Mr. Denman, one of the plaintiff’s witnesses, the first ten units listed are those employing separate engines to turn the mixer drums. Seven of them were ’reported by appellee at 74 break horsepower and assessed by appellant at 86, leaving a difference of 12 horsepower on which tax is due. Three of the ten trucks reported by ap-pellee are SO break horsepower and are assessed by appellant at 48, giving a credit due appellee of 2 horsepower as to them.
For the years in question the tax due on the seven trucks levied on a total 228 horsepower and the credit on the other three trucks is ten, giving a tax due for all years on a net 218 horsepower. Taxing this horsepower at 50‡ per horsepower per an-num makes a total due of $109.00, plus interest as provided by the statute at the rate of one-half per cent per month until paid.
For the foregoing reasons the judgment of the Trial Court insofar as it fails to tax the ten trucks which employ separate engines to turn the mixer drum is reversed, and judgment is now rendered in favor of the plaintiff against the defendant for the tax due on these ten trucks, in the amount of *147 $109.00, plus interest at the rate of one-half per cent per month until paid.
In all other respects the judgment of the Lower Court is hereby affirmed. Cost of this appeal to be borne by the defendant appellee and all other costs by plaintiff appellant.
Reversed in part and affirmed in part.